IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

**FILED**

NOV 2 2 1999

Phil Lombardi, Clerk
U.S. DISTRICT COURT

| | |
|---|---|
| United States, ) | |
|     Plaintiff, ) | |
| v. ) | Case No. 99-CR-23-H-05 |
| NORMAN FOSTER, ) | |
|     Defendant ) | |

## SENTENCING MEMORANDUM
## OF DEFENDANT NORMAN FOSTER

### Introduction

Mr. Foster was indicted for and pled guilty to conspiring to distribute marijuana. He bought marijuana from Codefendant Steve Moore and resold it in small quantities to a few people. Sometimes he would enter the Northern District of Oklahoma in order to do this.

As it turns out, Mr. Moore was involved in a huge marijuana smuggling ring. Mr. Moore would fly marijuana from Mexico to all kinds of destinations, including the Northern District of Oklahoma and Michigan, among other places. There were a great many people involved in the smuggling operation in a wide variety of capacities.

The Presentence Investigation Report ("PSR") omits a downward adjustment for Mr. Foster being a minimal participant. The PSR also attributes marijuana transactions to Mr. Foster that had nothing to do with the offense of conviction. Correction of these oversights results in a total offense level of 4, as opposed to one of 13.

Each oversight is addressed in turn.

### Mr. Foster's Minimal Participation

Mr. Foster was a "minimal participant" under U.S.S.G. § 3B1.2(a) in the criminal activity set forth in the Second Superseding Indictment.

Mr. Foster knew nothing of the scope and structure of the smuggling operation to which he found out (after indictment) that he was connected. Mr. Foster did not know that Mr. Moore obtained marijuana from Mexico. Mr. Foster did not know the magnitude of Mr. Moore's operation. Mr. Foster did not know the number of people to whom Mr. Moore sold marijuana. Mr. Foster did not know the quantity of marijuana moved by Mr. Moore. Mr. Foster did not know the number of States through which Mr. Moore operated. Mr. Foster did not know the number of people who helped Mr. Moore transport and distribute marijuana. Mr. Foster did not know their names or the capacities in which they operated.

This falls squarely within the terms to the Minimal Participant provision: "Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and the activities of others is indicative of a role as a minor participant." U.S.S.G. § 3B1.2, comment. (n.1); (See also U.S. v. Olson, (10th Cir., Dec. 15, 1995)(unpublished)(attached hereto as exhibit "A"): "I find that there was a great deal that [Olson] was not aware of in this matter...things... clearly were kept from him and were not disclosed and were significant in terms of this operation...").

To use more terms set forth in the text of the Guideline, of the "concerted activity" set forth in the Second Superseding Indictment, Mr. Foster was "plainly among the least culpable of those involved." (See U.S.S.G. § 3B1.2, comment. (n.1))

He was named in only one of the five counts. Codefendants Victor Moore, Youngpeter and

2

Braswell were named in three. Codefendant Cochrane is named in two. Mr. Foster is named in only two overt acts of the count to which he pled guilty. Codefendant Steven Moore is named in thirteen. Codefendant Wehba is named in four. Codefendant Nixon's name appears in three. A reduction in one's offense level is called for when he is less culpable than other defendants: U.S. v. DeMasi, 40 F.3d 1306, 1323 (1st Cir. 1994); U.S. v. Mitchell, 49 F.3d 769, 785 (D.C. Cir. 1995); U.S. v. Giraldi, 86 F.3d 1368, 1378 (5th Cir. 1996); U.S. v. Haut, 107 F.3d 213, 217 (3d Cir. 1997).[1]

The Probation Office's response misapprehends Mr. Foster's objections on this point. Mr. Foster is **not** saying that he is being sentenced for the entire amount of drugs attributable to the conspiracy (Pp. 2 and 3 of the Addendum to the PSR). He **is** saying that he was less culpable than most of the others **and** that he knew nothing about the scope and structure of the Steven Moore/Jorge Mata marijuana smuggling enterprise. The Probation Office does not dispute these facts.[2] There is a reason why the Probation Office does not dispute these facts: they are indisputable.

### Irrelevant Conduct-No Nexus

Simply put, to be "relevant conduct" under U.S.S.G. § 1B1.3, the conduct must be "relevant," i.e., "connected" to the offense of conviction: "Only after the government has met its burden of establishing, by a preponderance of the evidence, a <u>sufficient nexus</u> between the [extraneous] conduct

---

[1] Denial of a downward adjustment under U.S.S.G. § 3B1.2 must be supported by findings on the record. U.S. v. Agee, 83 F.3d 882, 889 (7th Cir. 1996).

[2] There is a third ground on which Mr. Foster asserts entitlement to a minimal participant adjustment, the fact that he received no consideration for his minimal role in the prosecutor's charging decision. U.S. v. James, 157 F.3d 1218 (10th Cir. 1998) does not control the Minimal Participant analysis on the issues set forth above (less culpability than others and lack of knowledge as to the enterprise's scope and structure). Moreover, James, read as the Probation Office urges, would essentially read U.S.S.G. § 3B1.2, comment. (n.4) out of existence.

3

and the offense of conviction,'may the sentencing court, in its sound discretion, make a 'relevant conduct adjustment'" U.S. v. Null, (10th Cir., April 11, 1995)(unpublished)[3](citing U.S. v. Williams, 10 F.3d 910, 913 (1st Cir. 1993) and U.S. v. Sklar, 920 F.2d 107, 110 (1st Cir. 1990))[4](emphasis supplied by the Null court).

No such nexus exists on the record before the Court. The purchases from Mr. Jones were part of a different deal than the one to which Mr. Foster pled guilty, pure and simple. The lack of such a nexus makes such transactions improper sources of additional sentencing levels under U.S.S.G. § 1B1.3. See U.S. v. Mullins, 971 F.2d 1138, 1143-47 (4th Cir. 1992); U.S. v. Hill, 79 F.3d 1477, 1481-85 (6th Cir. 1996).

## Conclusion

Mr. Foster was a minimal participant in the concerted activity which became the subject of this case. He did not know of the structure or scope of the enterprise. He was clearly one of the least involved participants. The drug purchases from Mr. Jones had nothing to do with Mr. Foster buying drugs from Steven Moore and are therefore **not** "relevant conduct".

Mr. Foster's base offense level should be 10 because without the 15 pounds of marijuana attributed to him from Mr. Jones, Mr. Foster was responsible for between 1 and 2.5 Kilograms of

---

[3] The Null opinion is cited pursuant to the Tenth Circuit's Order of November 29, 1993, appearing at 151 F.R.D. 470. A copy of the Null opinion is attached hereto as exhibit "B".

[4] The absence of precedential opinions on the need for a connection between convicted and uncharged conduct to render the latter "relevant" for sentencing purposes is puzzling. Perhaps the point is so obvious that it shouldn't require a published opinion. The "nexus" requirement has a long history in the First Circuit. See U.S. v. Young, 74 F.3d 758, 763 (1st Cir. 1996); Williams, Supra, U.S. v. Reyes, 3 F.3d 29, 31 (1st Cir. 1993); U.S. v. Castellone, 985 F.2d 21, 24 (1st Cir. 1993); and Sklar, Supra.

4

marijuana. (See U.S.S.G. 2DL.1(a)(3)(c)(15))  Mr. Foster's total offense level should be further reduced by 4 levels owing to his minimal participation. He therefore should be sentenced with a total offense level of 4.[5]

                                        Respectfully submitted,

                                        */s/ J. Randolph Lynn*
                                        F. RANDOLPH LYNN, OBA #15296
                                        R. Thomas Seymour, Attorneys
                                        100 West Fifth Street, Suite 550
                                        Tulsa, OK 74103
                                        (918) 583-5791
                                        (918) 583-9251 - Fax

---

[5] This calculation reflects that Mr. Foster would not receive the third point reduction for acceptance since his base level is less than 16. (U.S.S.G. § 3E1.1(a)).

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was mailed with first class postage prepaid to Allen Litchfield, Esq., Assistant U.S. attorney at 333 West 4th Street, Tulsa, Oklahoma 74103 and to those listed below this the ___ day of November, 1999.

Charles Whitman, Esq.
Attorney for Steven Anthony Moore
403 South Cheyenne Avenue
Suite 1200
Tulsa, Oklahoma 74103
Tel: 582-9339; Fax: 583-1117

Jack Schisler, Esq.
Attorney for Lori Braswell
One West 3rd Street
Suite 1225
Tulsa, Oklahoma 74103
Tel: 581-7656; Fax: 581-7630

David C. Phillips, Esq.
Attorney for Victor Moore
115 West 3rd Street
Suite 525
Tulsa, Oklahoma 74103
Tel: 584-5062; Fax: 585-1005

Charles W. Prather, Esq.
Attorney for Michael Wehba
403 South Cheyenne
Tulsa, Oklahoma 74103
Tel: 584-4484

Randal D. Morley, Esq.
Attorney for Kathy McAuliff
1141 East 37th Street
Tulsa, Oklahoma 74105-3162
Tel: 743-8355; Fax: 743-7478

Lawrence R. Roberson, Esq.
Attorney for Jahna Anna Youngpeter
5555 South Peoria
Tulsa, Oklahoma 74105
Tel: 712-1994; Fax: 712-1995

Larry Morris
United States Probation Officer
333 West Fourth Street
Suite 3820
Tulsa, Oklahoma 74103-3819

*[signature]*
F. RANDOLPH LYNN

foster.20

76 F.3d 393, U.S. v. Olson, (C.A.10 (Wyo.) 1995)                                Page 1

**\*393** 76 F.3d 393

NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.

(The decision of the Court is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter.)

**UNITED STATES of America, Plaintiff-Appellant,**
v.
**Delton Owen OLSON, Defendant-Appellee.**

Nos. 95-8006 and 95-8019.
United States Court of Appeals,
Tenth Circuit.
Dec. 15, 1995.

ORDER AND JUDGMENT (FN\*)

Before BALDOCK, McWILLIAMS, REAVLEY (FN\*\*), Circuit Judges.

REAVLEY, Circuit Judge.

Delton Owen Olson was convicted by a jury of conspiracy to launder money. He was acquitted of wire fraud. Because of Olson's minimal participation in the investment scheme, the district court granted his motion for downward departure and sentenced him to 51 months imprisonment. We affirm.

Olson was charged in a multi-count indictment with Grady Hand (FN1) and the Cross brothers--Stewart and Stephen. The investment scheme undertaken by the conspirators involved NorthStar Investment Trust, its successor company SLM, and Cross & Associates. Olson and Stephen Cross were the manager and trustee, respectively, for NorthStar.

In March of 1993, Olson and Stephen began marketing a "roll program" through NorthStar to investors. This program was said to provide small investors with the opportunity to invest or "piggyback" into the larger "roll program" being conducted by Cross & Associates, a company comprised of Hand and Stewart. The investors were informed that Hand and Stewart were purchasing prime bank notes in the amount of 100 to 300 million dollars or more. Cross & Associates, through its trader, was supposed to purchase the notes at a discount from only the world's largest 100 banks. Cross & Associates would then contract with an institution in the secondary market to purchase these notes. This secondary market was described as pension funds, insurance companies, and large corporations. The actual "roll" or "tranche" was supposed to occur when Cross & Associates purchased the note from the bank with cash and then sold the note to the secondary market. The difference between the purchase and sale of these instruments was to result in a substantial profit to Cross & Associates and their investors. The investors were informed that because of bank and federal regulations the two parties were not able to deal directly with the other, thus creating the need for Cross & Associates. There was, in fact, no roll program.

Olson brought in the first investors, a divorced couple who still invested together, in March of 1993. The couple invested $500,000 each. Investors were paid the two to 4 per cent per month return from their investment principal. The four conspirators looted much of the remaining money. In October of 1993 the investment scheme was ended by federal officials. In the end, Olson had personally taken a total of $326,000 of the investors' 3.3 million dollars.

I. Sufficiency of the Evidence

Olson challenges the sufficiency of the evidence to support his conviction. He argues that the evidence does not establish that there was an agreement between the alleged co-conspirators to launder money or that money laundering occurred. We review the evidence in the light most favorable to the government to determine whether any rational trier of fact could find Olson guilty beyond a reasonable doubt. *United States v. Hanson,* 41 F.3d 580, 582 (10th Cir.1994).

Olson was charged with conspiracy to violate 18 U.S.C. § 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i). Those sections provide:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--

(A)(i) with the intent to promote the carrying on of

Copyright (c) West Group 1998  No claim to original U.S. Govt. works



76 F.3d 393, U.S. v. Olson, (C.A.10 (Wyo.) 1995) **Page 2**

specified unlawful activity; or

\* \* \*
\* \* \*

(B) knowing that the transaction is designed in whole or in part--

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity ...

*393_ shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

The "specified unlawful activity" alleged in the indictment was mail or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

A. The Conspiracy

The government proceeded under the basic theory that Olson and others conspired to violate § 1956(a)(1)(A)(i) or (B)(i). 18 U.S.C. § 1956(h). To prove a conspiracy, the government must prove: (1) the existence of an agreement; (2) to break the law; (3) an overt act; (4) in furtherance of the conspiracy's object; and (5) that a defendant willfully entered the conspiracy. *Hanson*, 41 F.3d at 582; 18 U.S.C. § 371. "While all five of these elements must be present, the essence of any conspiracy is 'the agreement or confederation to commit a crime.' " *Id*. (quoting *United States v. Bayer*, 331 U.S. 532, 542, 67 S.Ct. 1394, 1399, 91 L.Ed. 1654 (1947)). "The agreement need not be shown to have been explicit. It can instead be inferred from the facts and circumstances of the case." *Iannelli v. United States*, 420 U.S. 770, 777, n. 10, 95 S.Ct. 1284, 1289-90, n. 10, 43 L.Ed.2d 616 (1975)

Olson's defense and his contention on appeal is that he was unaware of the fraud being perpetrated by Cross & Associates. He insists that there is no evidence of any agreement between him and any of the other co-conspirators. The government relied on circumstantial evidence to establish the agreement between the conspirators. In support of his argument, Olson notes that Stewart Cross never informed him that the "roll program" did not exist, that he received false reports concerning investor profits in the "roll program," that he did not have access to or control over investor funds at any time, and that he did everything in his power to assure investor monies were secure. Our inquiry is not whether the Cross brothers knew Olson was aware of the object of the conspiracy, but whether Olson knew of the object of the conspiracy and voluntarily chose to participate in it. *See United States v. Evans*, 970 F.2d 663, 669 (10th Cir.1992), *cert. denied*, 113 S.Ct. 1288 (1993) ("A defendant may be convicted of conspiracy only if the government proves that the defendant had knowledge of the conspiracy and voluntarily participated therein."); *United States v. Metropolitan Enters.*, 728 F.2d 444, 451 (10th Cir.1984) ("A co-conspirator need not know of the existence or identity of the other members of the conspiracy or the full extent of the conspiracy.") Olson's actions and statements to others indicate that Olson knew the roll program did not exist and chose to participate in the overall objective of the conspiracy.

Olson began marketing the fictitious "roll program" in March of 1993. In that month he received the program's first investment of 1 million dollars, $500,000 each from the divorced couple. In April of 1993 the couple received their first interest check of 3 1/2 per cent or $17,500 each. Also in April the Securities and Exchange Commission inquired of Olson about NorthStar's securities activities. In an effort to avoid detection, Olson and Stephen Cross created a new entity called SLM. To further eliminate NorthStar's existence, Olson replicated NorthStar's investor management agreements with SLM as the new investment company. Olson created and sent a new agreement to each investor. The new agreements were signed by Olson using a rubber stamp of Stephen Cross's signature. The investors were then asked to sign the "new" agreements and return the old NorthStar agreements. One could easily surmise this last request was to eliminate any trace of NorthStar.

Olson met with an attorney in April to discuss the S.E.C. letter. As a result of this meeting, Olson responded to the S.E.C. in June of 1993. In that letter Olson specifically stated that "[t]here is not now nor has there been any agreement between the trust and any entity for the promotion and sale of any investment program, including a roll program." The letter also noted that all NorthStar activity had ceased. It noted, "[t]here will be no further activity in this area by the trust and the trust has had no other contact with any other potential participant for the purchase and sale of prime bank obligations." Further, Olson

Copyright (c) West Group 1998 No claim to original U.S. Govt. works

76 F.3d 393, U.S. v. Olson, (C.A.10 (Wyo.) 1995)                                      **Page 3**

related to the S.E.C. that "[a]t no time has there ever been any person or persons that have invested in [NorthStar]." Contrary to his letter to the S.E.C., Olson was still marketing a "roll program" through SLM. In a letter to an investor in September of 1993, Olson wrote, "I am pleased to inform you that we have further strengthened our piggybacking program with Cross & Associates. To simplify the mechanics and to insure our longevity with Cross & Associates, we're now piggybacking on Cross' large trading account at Paine-Webber."

*393_ Olson also made numerous false representations to investors concerning the program. Olson represented that he had seen several accounts during his time at Anovest, the brokerage company that controlled investor funds through Paine-Webber, in excess of three million dollars. He assured investors that he had personally seen trading confirmations. When one investor questioned Olson about possible S.E.C. implications, Olson replied that "[w]e have a ruling, you know, from an attorney or an opinion from an attorney stating that this does not fall within the realm of the S.E.C.; therefore, it does not need to be regulated through the S.E.C."

During the month of April, Olson was aware that investors were receiving interest checks for their investment through NorthStar. Olson's attorney testified that Olson informed him in April there was no roll program in existence. Contrary to this knowledge that the program did not exist, Olson continued to promote, profit, and participate in the scheme during and after the month of April. A rational jury could conclude from this evidence that Olson had joined the conspiracy and had agreed to continue to market the nonexistent "roll program."

### B. Money Laundering

Olson also contends that the money he gained from the illegal activity was spent personally, and therefore, does not constitute money laundering. While he did use some of the money for himself, that is not the whole story. Much of the money Olson received from NorthStar was spent to further promote NorthStar or SLM. In fact, Olson himself testified that some of the money he received was spent to pay the business expenses of NorthStar whose only apparent business was to promote the "roll program." Additionally, Olson used investor funds to pay other brokers who brought investors into the program. A total of $54,920 was paid to these intermediate brokers. (FN2) The evidence is sufficient to support a jury's conclusion that Olson used investor money obtained illegally through wire fraud to continue to "promote" the ongoing scheme. *See* 18 U.S.C. § 1956(a)(1)(A)(i).

### C. Acquittal on Wire Fraud

Olson also argues that because the jury found him not guilty of wire fraud, the evidence is insufficient to support the conspiracy charge. Even assuming that the verdicts are inconsistent, Olson may not challenge the propriety of his conspiracy conviction with the jury's action in the wire fraud count. *See United States v. Powell*, 469 U.S. 57, 66, 105 S.Ct. 471, 477, 83 L.Ed.2d 461 (1984) ("The fact that the inconsistency may be the result of lenity, coupled with the Government's inability to invoke review, suggests that inconsistent verdicts should not be reviewable."); *United States v. Abbott Washroom Systems, Inc.*, 49 F.3d 619, 622 (10th Cir.1995) (a corporate defendant cannot use acquittal of employee co-defendant to challenge the corporate defendant's conviction.) (FN3)

### II. The Decrease in Olson's Sentence

The government contends in a cross-appeal that the district court improperly granted Olson a four-level decrease for "minimal participation" in his adjusted offense level under the Sentencing Guidelines. *See* U.S.S.G. § 3B1.2(a). "A trial court' findings concerning a defendant's role in a particular offense are treated by an appellate court as factual findings, which are subject to deferential review under the clearly erroneous standard." *United States v. Santistevan*, 39 F.3d 250, 253 (10th Cir.1994). The finding will not be disturbed unless it is without factual support in the record, or if after reviewing the evidence we are left with a definite and firm conviction that a mistake has been made. *Santistevan*, 39 F.3d at 253-254. Application note one to section 3B1.2 states that the mitigating circumstance for minimal participation

is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of the group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant.

In determining Olson was only a minimal participant in the overall conspiracy, the district court noted,

Copyright (c) West Group 1998    No claim to original U.S. Govt. works

76 F.3d 393, U.S. v. Olson, (C.A.10 (Wyo.) 1995)                                                    Page 4

I find that there was a great deal that [Olson] was not aware of in this matter. And had he been aware, I would be speculating on what might have happened. We don't know is the point. And it seems unfair to me to, in effect, charge him with things--with activities that clearly were kept from him and were not disclosed and were significant in terms of this operation from the very beginning because it was within a day or two of the [couple's investment of one million dollars]--around March 31, 1993 of [their] investment that those funds were slipping away through loan transactions with [Hand] that [Olson was] not aware of and through loans, dunning (sic) loans to Stephen and to Cross & Associates.

The district court's ruling that Olson was plainly among the least culpable of the conspirators is not clearly erroneous. The court's ruling is supported by the actions of his co-conspirators in their acquisition of investor funds without Olson's knowledge and their apparent attempt to keep much of the details of the scam from Olson.

*393_ In March of 1993, Hand and the Cross brothers decided to "borrow" $300,000 of the divorced couple's investment funds from their brokerage account. The three conspirators agreed to classify this transaction as a loan. As the months passed more money would be "borrowed" from investor funds. Investor funds were controlled by Cross & Associates in Atlanta, and investor statements were prepared and mailed from Cross & Associates in Atlanta. The conspirators in Atlanta perhaps attempted, although unsuccessfully, to keep Olson from discovering that the "roll program" was a ruse. Hand and the Cross brothers all misinformed Olson to further the investment scheme. While Olson was aware the program was non-existent and participated in its overall objectives, thus making him a member of the conspiracy, the district court did not clearly err in determining Olson was a minimal participant because of the actions of his co-conspirators.

AFFIRMED.

FN* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470.

FN** The Honorable Thomas M. Reavley, United States Court of Appeals, Fifth Circuit, sitting by designation.

FN1. Grady Lewis Hand has filed a related opinion, No. 95-8007.

FN2. The evidence indicates that much more money was supposed to be paid to the other brokers, but, unbeknownst to the other co-conspirators Olson kept the difference.

FN3. This does not call into question the limited rule of consistency that is applied to where all co-conspirators are acquitted but one. *See Abbott Washroom Systems, Inc.,* 49 F.3d at 622-623.

Copyright (c) West Group 1998   No claim to original U.S. Govt. works

52 F.3d 339, U.S. v. Null, (C.A.10 (Okla.) 1995)          Page 1

**\*339** 52 F.3d 339
NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.

(The decision of the Court is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter.)

**UNITED STATES of America, Plaintiff-Appellee,
v.
Wayne Edward NULL, a/k/a Edward Wayne Noll, Jr., a/k/a Wayne
Eddie Noel, Defendant-Appellant.**

No. 94-6284.
United States Court of Appeals, Tenth Circuit.
April 11, 1995.

ORDER AND JUDGMENT (FN1)

Before MOORE, BRIGHT, (FN2) and BALDOCK, Circuit Judges.

Wayne Edward Null protests the eighteen-month sentence he received for pleading guilty to giving false information to obtain a social security number in violation of 42 U.S.C. 408(7)(A); and causing a federally insured bank to submit a report containing material misstatements of fact in violation of 31 U.S.C. 5324(2). Triggering the incorrect calculation of his sentence under U.S.S.G. 2F1.1, he contends, is the inclusion as relevant conduct of the loss on his home mortgage. The district court properly found Null's manipulation of his home mortgage was part of the same scheme of criminal conduct underlying the counts of conviction. We, therefore, affirm.

Because the parties are well-versed in the underlying facts, we eschew their recitation here unless they are necessary to the principle on review. At issue is the mortgage for $199,750 executed in 1984 on Null's home at 2201 Dawn Marie Road in Oklahoma City. In July 1988, Null transferred title to this property to Hazel Bigbee, a longtime friend. The following month, however, Null ceased making payments on the mortgage, telling the Brumbaugh & Fulton Mortgage Company, working part-time, he earned only about $800 a month. After internal review and consultation with its private mortgage insurer, Brumbaugh commenced foreclosure proceedings and, in June 1989, sold the property at a sheriff's sale for $85,453.85. The purchaser was Null's business associate who used money Null provided. Throughout this time, Null continued to live in the Dawn Marie residence.

The Presentence Report (PSR) included the Dawn Marie transaction as relevant conduct occurring during the time that Null submitted false applications for social security numbers used to open bank accounts at, for example, the Bank of Oklahoma, Home Federal Savings and Loan, and Texas First Securities Corporation. From approximately 1988 to 1990, Null deposited over $500,000 into these accounts. That is, during the time Null represented to creditors he could not meet his debt obligations, he similarly defaulted on his home mortgage, forcing the property into foreclosure, and then repurchasing it with his own money through a straw buyer.

Null, however, objected to the PSR's including the Dawn Marie mortgage transaction as relevant conduct to calculate his base offense level. After a hearing on this and other objections to the PSR, the district court stated,

The objection with respect to the Dawn Marie transaction is overruled, and this it just seems to me is a classic example of conduct intended to disguise assets so as to remove them from the ability of a creditor to collect....

When we came down to the point where Mr. Null declined to make additional payments, he was more financially distressed than he previously had been, but the evidence is clear that he did have assets that were disguised and hidden under aliases and phony and bogus SSN's....

....

There need not be a finding of specific illegality in Mr. Null's taking the course of action that he did.... That could possibly be shown to be fraudulent, it could possibly be shown to be an offense under Federal law because of the use of a false Social Security number, but that doesn't make any difference. We're talking about relevant conduct here, and the termination of payments and the buy-in at $85,000 is <u>connected with and in relation to and supplementary to the use of the bogus SSN's</u> for disguising assets or, as has been referred here

Copyright (c) West Group 1998   No claim to original U.S. Govt. works

DEFENDANT'S
EXHIBIT
B

52 F.3d 339, U.S. v. Null, (C.A.10 (Okla.) 1995)                                                                 Page 2

several times, "squirreling away" assets.

(emphasis and italics added).

By including the $139,000 loss on the home mortgage and adjusting other loss figures, the district court increased the base offense level of six, U.S.S.G. 2F1.1(a), by seven levels to reflect a loss of more than $120,000. U.S.S.G. 2F1.1(b)(1)(H). From the resulting guideline range of twelve to eighteen months, the district court sentenced Null to eighteen months' imprisonment. The court also imposed a $3,000 fine and term of supervised release.

*339_ On appeal, Null contends the evidence of loss underpinning the district court's guideline range lacked sufficient indicia of reliability and was not established by a preponderance. What Null actually argues, however, is that nothing involved in the foreclosure related to the fraud. That is, there was no cognizable loss. Indeed, during oral argument, when asked whether $139,000 or $85,000 was the correct figure for the mortgage loss, Null's counsel responded that no amount of loss attributed to the mortgage should have been included. Instead, turning the tables, Null argued any fault by commission or omission was attributable to Brumbaugh, which made no inquiry about his assets, sought no deficiency judgment, and simply chose an in rem judgment on the property in a civil foreclosure proceeding. Null, thus, transformed his contention about the factual support for the calculation of loss under 2F1.1 into a challenge to its very character as relevant conduct under 1B1.3.

Absent an error of law, we review the district court's findings of relevant conduct for clear error. "Only after the government has met its burden of establishing, by a preponderance of the evidence, a sufficient nexus between the [extraneous] conduct and the offense of conviction,' may the sentencing court, in its sound discretion, make a relevant conduct' adjustment." United States v. Williams, 10 F.3d 910, 913 (1st Cir.1993) (citing United States v. Sklar, 920 F.2d 107, 110 (1st Cir.1990) (emphasis added)).

The legal parameter for our review is the definition of relevant conduct found in 1B1.3(a)(1)(A):

all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant ...

....

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

In this case, the "acts" of the offense of conviction are substantially connected by a common purpose of evading creditors by hiding assets. The "harm" was the same whether the victim was Shearson Lehman or Brumbaugh.

To excise the Dawn Marie transaction from this "common purpose" by clothing it as a civil fortuity caused by the downturn in the Oklahoma economy then strains credulity and tortures the obvious intent of each of Null's acts. The government established by a preponderance the Dawn Marie mortgage transaction bore a sufficient nexus to the fraud Null perpetrated on other creditors through the device of hiding assets under false social security numbers and was properly characterized as relevant conduct used to increase Null's base offense level.

Moreover, in the context of relevant criminal conduct, we have stated that the "harm" suffered by a victim as a direct result of fraudulent acts "result[s] from the acts committed ... by the defendant ... during the commission of the offense." United States v. Fox, 999 F.2d 483, 486 (10th Cir.1993) (citing 1B1.3). The mortgage transaction occurred at the same time that Null procured and used false social security numbers to open bank accounts into which he placed assets he told Brumbaugh he lacked. (FN3) The mortgage transaction bears the same indicia of subterfuge as Null's offense conduct.

The district court's correctly reaching this conclusion merits affirmance. We therefore AFFIRM.

FN1. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470.

FN2. The Honorable Myron H. Bright, Senior Judge for the United States Court of Appeals for the Eighth Circuit, sitting by designation.

FN3. It further strains credulity that in the face of

Copyright (c) West Group 1998  No claim to original U.S. Govt. works

52 F.3d 339, U.S. v. Null, (C.A.10 (Okla.) 1995) **Page 3**

Null's fraudulent scheme, he would have told the mortgagee, if asked, what and where his assets were placed.

Copyright (c) West Group 1998  No claim to original U.S. Govt. works

Page 3